DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Rodney H. ("Father"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated his parental rights to his two minor children and placed them in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.
 I. {¶ 2} Father is the natural father of J.H., born November 16, 1994, and T.S., born May 12, 1995. Father's children have two different mothers, who are not parties to this appeal. On August 14, 2006, CSB filed complaints, alleging that J.H. and T.S. were neglected and dependent children primarily due to the deplorable living conditions of their home. At that time, the children were living in a home with Father, each of their mothers, and Father's girlfriend.
 {¶ 3} A magistrate adjudicated J.H. and T.S. neglected and dependent children and later placed them in the temporary custody of CSB. The trial court adopted the magistrate's *Page 2 
decisions. Father filed timely objections to the magistrate's decisions, which were overruled by the trial court. This Court affirmed the adjudication and disposition on appeal. In re J.H., 9th Dist. No. 23605,2007-Ohio-4653, at ¶ 26.
 {¶ 4} On July 28, 2008, CSB moved for permanent custody of both children. The trial court held an evidentiary hearing on CSB's motion as well as the parents' motions for legal custody or for a six-month extension of temporary custody. The trial court found that the children could not be placed with either parent within a reasonable time or should not be placed with them and that permanent custody was in their best interests. Consequently, the trial court terminated parental rights and placed J.H. and T.S. in the permanent custody of CSB. Father appeals and raises two assignments of error, which will be addressed together because Father argues them jointly.
 II. ASSIGNMENT OF ERROR I "THE COURT'S GRANTING OF PERMANENT CUSTODY TO [CSB] AND/OR THE COURT'S DENIAL OF [FATHER'S] MOTION FOR LEGAL CUSTODY OF HIS CHILDREN AND/OR HIS MOTION FOR A [SIX-MONTH] EXTENSION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PER R.C. § 2151.414."
 ASSIGNMENT OF ERROR II "THE TRIAL COURT ABUSED ITS DISCRETION UNDER R.C. § 2151.414 IN ORDERING [FATHER'S] CHILDREN INTO THE PERMANENT CUSTODY OF [CSB] AND/OR IN DENYING [FATHER'S] MOTIONS FOR EITHER A [SIX-MONTH] EXTENSION OR HIS MOTION FOR LEGAL CUSTODY OF HIS CHILDREN[.]"
 {¶ 5} Father maintains that the trial court erred in terminating his parental rights and placing his children in the permanent custody of CSB. Before a juvenile court can terminate parental rights and award to a proper moving agency permanent custody of a child, it must find *Page 3 
clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and 2151.414(B)(2); see, also, In re William S. (1996), 75 Ohio St.3d 95, 99.
 {¶ 6} The trial court found that the first prong of the permanent custody test was satisfied because J.H. and T.S. could not be placed with either parent within a reasonable time or should not be placed with either parent. See R.C. 2151.414(E). Specifically, the trial court found that CSB had proven the conditions set forth in R.C. 2151.414(E)(1), R.C. 2151.414(E)(2), and R.C. 2151.414(E)(16). Because R.C. 2151.414(E) mandates that the trial court enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with them if one of the enumerated conditions exists, any of the trial court's three findings would support its decision on the first prong of the permanent custody test. See In re J.E., 9th Dist. No. 23865, 2008-Ohio-412, at ¶ 14. This Court will confine its review to the trial court's finding under R.C. 2151.414(E)(1).
 {¶ 7} The trial court had substantial evidence before it to support its conclusion that, following the placement of the children outside the home, Father "failed continuously and repeatedly to substantially remedy the conditions causing the [children] to be placed outside [their] home." R.C. 2151.414(E)(1). The children were initially removed from the home due to unsanitary living conditions, including trash and food scattered throughout the house, flea infestation, and animal urine and feces that was visible in several rooms and created such a *Page 4 
strong stench that inspectors could barely tolerate the odor inside the home. CSB was also concerned that Father's girlfriend was living in the home because she was a registered sexually oriented offender who had victimized a girl the same age as Father's two daughters.
 {¶ 8} Father points to evidence that, by the time of the permanent custody hearing, he had secured suitable housing and the girlfriend was no longer living with him. Focusing solely on the initial reasons for removal of the children from his home, Father contends that the evidence established that he had substantially remedied the conditions that caused the children to be placed outside the home.
 {¶ 9} The trial court had before it, however, evidence that Father had failed to remedy other conditions that had caused the trial court to continue the children's placement outside his home. Although Father suggests that the trial court had no authority to consider parenting problems that were not set forth in CSB's dependency and neglect complaint, the language of R.C. 2151.414(E)(1) is not limited to home conditions that were identified by the agency at the time of the initial removal of the children. R.C. 2151.414(E)(1) requires clear and convincing evidence that the parent failed to substantially remedy "the conditions causing the [children] to be placed outside [their] home." This Court has construed this language to encompass not only the conditions that led to the initial removal of the children from the home, but also problems with the home environment that the agency identified after the children's removal, which caused the juvenile court to continue its placement of the children outside the home. See, e.g.,In re A.C., 9th Dist. No. 23627, 2007-Ohio-5525, at ¶ 17-22.
 {¶ 10} As part of the case plan requirements for reunification with his children, Father was required to complete a parenting assessment and follow all of the counselor's treatment recommendations. The licensed professional clinical counselor who performed Father's *Page 5 
parenting assessment testified that the purpose of a parenting assessment is to identify any mental health issues that have an impact upon an individual's ability to parent their children. The counselor further explained that, if the counselor identifies mental health issues during a parenting assessment, she should set forth a treatment plan for addressing the individual's parenting problems.
 {¶ 11} The counselor diagnosed Father with narcissistic personality disorder. She explained that a person with narcissistic personality disorder sees himself as better than others and tends to exploit his relationships to serve his own needs. She further testified that Father's disorder prevents him from being able to empathize with or relate to the needs of others. The counselor expressed serious doubt about Father's ability to parent his daughters in any sort of nurturing or supportive manner because he would not tend put their needs ahead of his own.
 {¶ 12} The counselor also reported her conclusion that Father had a high level of anger and was not able to channel it appropriately. In addition to two prior domestic violence convictions, Father admitted to the counselor that he was a very vindictive person and that if "you screw with me, I will get you back one way or another." Several witnesses testified that they had observed Father being extremely argumentative in his interaction with others and that he had even threatened to "blow up" CSB and to get a gun and shoot any caseworker who came to his house. Although the witnesses indicated that they did not think that Father would actually carry out such extreme acts of violence, they were concerned that he reacted to this situation with such a high level of anger. They also expressed concern that Father blamed his family's situation on others, such as CSB and the mothers of his children, rather than accepting some responsibility himself. *Page 6 
 {¶ 13} According to the counselor, Father's narcissistic personality disorder and anger management issues prevented him from parenting his children appropriately. Therefore, as part of the parenting assessment, the counselor set forth a recommended course of treatment for Father to address these issues. First, she recommended that Father participate in "intensive therapy" to address his personality disorder. The counselor explained that Father would need ongoing counseling at least once a week and that, even with intensive counseling, it would be "extremely difficult" to treat his disorder because it involved ingrained personality traits. In addition to counseling, she recommended that Father complete an intensive program of parenting classes. The counselor also indicated that Father should participate in anger management classes for at least six months to a year due to the high level of anger that he exhibited. Finally, Father was required to return to the counselor for a follow-up assessment in one year, after completing all of the recommended treatment, to determine whether he had been able to resolve his parenting problems.
 {¶ 14} Because Father refused to sign releases, CSB was not able to monitor his progress on the case plan to determine whether he was participating in the required treatment. Father conceded that he attended only a few counseling sessions and then stopped going. He also admitted that he did not attempt to seek many of the services that CSB referred him to. Father did complete some anger management and parenting classes, but neither program was of the intensity that the counselor had recommended.
 {¶ 15} The record reflects that Father's behavior showed no improvement during the two-year case planning period. The testimony of several witnesses, as well as journal entries and court filings, gave numerous examples of how Father continued to act in a derogatory, argumentative, and even threatening manner to almost everyone involved in this case. In fact, *Page 7 
the guardian ad litem and the children's attorney were so concerned about his inappropriate interaction with his children during visits that they filed a written opposition to any increased visitation and the trial court refused to increase visitation for that reason.
 {¶ 16} The trial court had ample evidence before it to support its conclusion that Father had failed to substantially remedy the conditions that caused the children to be placed outside the home. Therefore, the trial court was required by R.C. 2151.414(E) to conclude that the children could not be placed with either parent within a reasonable time or should not be placed with them.
 {¶ 17} After the trial court found that J.H. and T.S. could not be placed with either parent due to one or more of the factors under R.C. 2151.414(E), it was required to determine whether permanent custody was in their best interests. When determining whether a grant of permanent custody is in the children's best interests, the juvenile court must consider all the relevant factors, including those enumerated in R.C. 2151.41.4(D): the interaction and interrelationships of the children, the wishes of the children, the custodial history of the children, and the children's need for permanence in their lives. See In re S.N., 9th Dist. No. 23571, 2007-Ohio-2196, at ¶ 27.
 {¶ 18} The interaction and interrelationship between Father and his children during the two-year pendency of this case was limited to supervised visitation. The evidence demonstrated that Father did not engage in much interaction with his children during these visits, but instead tended to sit in the background and observe. There was testimony that, during several of the visits, one or both of the girls would attempt to involve Father in their games, but he repeatedly refused to participate. At most, Father would talk to the girls, but he had no interest in playing any of the games that they suggested. Thus, J.H. and T.S. tended to play with each other rather than interact with Father. *Page 8 
 {¶ 19} When Father spoke to his daughters, his conversation was often inappropriate. In addition to discussing adult topics with them, he often used derogatory terms to refer to his daughters. J.H. had a weight problem and low self-esteem, yet Father would call her Butterball, Porky, refer to her as fat, or make other insulting comments about her weight. Father called T.S. a "retard" in reference to her very low IQ. In addition to Father's behavior having a negative impact on his daughters' self-esteem, the counselor explained that Father was a poor role model for his adolescent daughters because he perceives women and girls as being beneath him. The counselor also voiced concern about Father living with multiple women and engaging in multiple sexual relationships in the home of his daughters. As she emphasized, "[c]ertainly the modeling is very inappropriate" as he was sending a message to his daughters that his behavior was acceptable.
 {¶ 20} In addition to the concerns expressed by the children's attorney and the guardian ad litem, the children were also opposed to having increased visitation with their Father. Consequently, the trial court refused to increase Father's visitation. Father's visitation with T.S. never progressed beyond supervised visits every week or every other week. Father agreed to end all visits with J.H. several months before the permanent custody hearing.
 {¶ 21} Both J.H. and T.S. consistently expressed their wishes that they not return to their Father's home. J.H. expressed a desire to stay in her current foster home and to be adopted by that family if possible. J.H. also indicated that she would like to maintain a relationship with her half-sister, T.S., and be adopted with her.
 {¶ 22} The guardian ad litem, who had been assigned to this case for more than two years, opined that permanent custody was in the best interests of both children. After making numerous contacts with everyone involved in this case, the guardian prepared an extensive, 25-page *Page 9 
written report that she submitted to the trial court. The guardian also testified and was subject to cross-examination at the hearing. Ultimately, her recommendation focused on the wishes of the children and Father's failure to complete most of the objectives of the case plan. The guardian emphasized that Father refused to, or was unable to, put the interests of his daughters ahead of his own.
 {¶ 23} J.H. had spent most of her life living in the custody of someone other than Father. She lived primarily with her mother until approximately two years before this case began when she and her mother moved in with Father. Father testified that he never saw J.H. on a regular basis prior to that time because her mother would not let him. T.S., on the other hand, lived with Father and her mother for most of her life prior to the beginning of this case. For the two years prior to the permanent custody hearing, however, both girls had lived in the temporary custody of CSB.
 {¶ 24} At the time of the permanent custody hearing, the children had been placed outside the home for more than two years and were in need of a legally secure permanent placement. Both children have below-average intelligence, but T.S. has a very low IQ and is extremely low functioning. In addition to her low intelligence, T.S. has numerous physical and mental problems that require ongoing counseling, medication, and medical care. The evidence demonstrated that both girls are in need of a legally secure permanent placement and that none of their parents was able to provide them with a suitable permanent home, nor were there any relatives willing or able to do so. Thus, the trial court reasonably concluded that a legally secure permanent placement could only be achieved through a grant of permanent custody to CSB.
 {¶ 25} The evidence before the trial court established that J.H. and T.S. could not be placed with their parents within a reasonable time or should not be placed with them and that *Page 10 
permanent custody was in their best interests. Therefore, the trial court did not err in terminating Father's parental rights and placing the children in the permanent custody of CSB. Father's assignments of error are overruled.
 III. {¶ 26} Father's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to Appellant.
DICKINSON, J. BELFANCE, J. CONCUR. *Page 1